**STATE of Missouri, Respondent,**

v.

**Lena M. BUHR, Appellant.**

**No. WD 64104.**

Missouri Court of Appeals,
Western District.

Aug. 16, 2005.

Jeremiah W. (Jay) Nixon, Atty. Gen., Alison K. Brown, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

Sarah Weber Patel, Asst. Appellate Defender, Kansas City, MO, for Appellant.

Before HOWARD, P.J., and SMART and NEWTON, JJ.

VICTOR C. HOWARD, Presiding Judge.

Lena M. Buhr ("Buhr") was convicted of endangering the welfare of a child in the first degree pursuant to section 568.045,[1] and she now appeals. Buhr argues on appeal that the trial court erred in overruling her motions for judgment of acquittal and in sentencing her for endangering the welfare of a child in the first degree, in violation of her right to due process as provided by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, § 10 of the Missouri Constitution. Buhr claims that the State did not prove beyond a reasonable doubt that her act of allowing Bryon Griffin ("Griffin"), her boyfriend, to have contact with Anthony, her son, on or about June 6, 2002, would result in an actual risk to Anthony's life, body, or health, or that Buhr knowingly created that risk. For the reasons stated below, we affirm.

## Background

Buhr was charged by Indictment in Jackson County with one count of murder in the second degree, two counts of endangering the welfare of a child in the first degree, one count of hindering the prosecution of a felony, and one count of tampering with physical evidence in a felony prosecution. The case was tried by jury in the Circuit Court of Jackson County on January 26 and 27, 2004, before the Honorable Michael W. Manners. Buhr appeals only her conviction for endangering the welfare of a child in the first degree in violation of section 568.045. The following evidence was adduced at trial.

In 2001, Buhr and her two sons, William and Anthony, moved in with Penny Webb ("Webb") at 9314 Independence Avenue, Independence, Missouri. At that time, Anthony was three years old and William was five years old. Griffin lived in an upstairs apartment at this same address. After Buhr moved in with Webb, she start-

---

1. Statutory references are to Revised Statutes of Missouri 2000, unless otherwise noted.

ed spending substantial amounts of time with Griffin.

In February 2002, Buhr showed Webb an injury to Anthony's testicles. Buhr told Webb that William had kicked Anthony. When Webb attempted to ask William if this was true, Buhr and Griffin interrupted and prevented William from speaking. To repair the damage, a tube was inserted into Anthony's testicles. Webb testified that each time Anthony would go to Griffin's apartment, Buhr would bring Anthony back down to Webb's apartment because the tube had come out. This happened three or four times, and each time Anthony would have to undergo another surgery to reinsert the tube.

Buhr moved in with Griffin in March 2002. William and Anthony alternated between staying with their mother and father, Frank Buhr, during this time. Sometime after Anthony's surgeries, Frank Buhr gained custody of the boys because of the abuse that Anthony was suffering. Buhr was restricted to having only supervised visits with the boys. On June 1, 2002, Frank Buhr took the boys back to their mother and told her that he could not care for them any longer.

After Buhr moved in with Griffin, Webb began to notice that Anthony was being hurt. She noticed injuries including: bruises, a black eye, and missing clumps of hair on his head. Deborah James ("James"), a caretaker for Buhr's father, also noticed injuries to Anthony. In late May 2002, when James last saw the boys, she noticed that Anthony's head was shaved, he had multiple bruises on his head and face, and he had a bloody black eye.

Around midnight on the night of June 5, 2002, James noticed that Buhr's father appeared to be having a stroke. James notified Buhr and offered to watch the boys so that Buhr could meet her father at the hospital. Buhr declined James' offer and told her that Griffin would watch the boys. At the time of the phone call, Webb was downstairs in her apartment and testified that she heard Buhr and Griffin arguing and fighting. Webb said she then heard Buhr crying as she ran down the stairs with Griffin in pursuit. Webb later noticed that Buhr had left. Webb then heard a muffled baby's cry.

While at the hospital with her father, Buhr called home to let Griffin know that she was on her way home. Buhr heard Anthony crying in the background. Buhr returned home about two hours after she had left. When Buhr returned, she saw Griffin choking Anthony, whose body was discolored and swollen. Buhr put Anthony on her bed and went into the bathroom, where she saw a hole in the wall above the toilet and that the bathroom was covered in blood. When Buhr asked Griffin what he had done, he replied that he had thrown Anthony through the wall, beat him, burned his genitals with a blow dryer, and shoved ice cubes up his rectum.

Downstairs, Webb realized that Buhr had returned home because she heard Griffin and Buhr yelling and fighting again. Webb became worried by the situation and called the police. In the meantime, Buhr called a nurse hotline. Buhr and Griffin told the nurse that Anthony had choked on some milk, but was now alert and breathing fine. They also told the nurse that Anthony suffered from allergies, that he had played at a house with mold in it earlier that day, and that he had suffered from a cold earlier in the week. The nurse heard knocking on the door, and Griffin told her that the police were there. The nurse instructed Griffin on how to treat Anthony based on the symptoms he had described, and the call ended.

Officer Brian Newsome ("Newsome") responded to Webb's 911 call and arrived at Griffin's apartment around 2:42 a.m. on June 6, 2002. Newsome told Griffin that he was investigating a noise complaint. Griffin told Newsome that Buhr was upset because her father had had a stroke and was in the hospital. Buhr told Newsome the same story and apologized for being loud. Buhr later admitted that she did not tell Newsome about Anthony because she was scared and was trying to protect Griffin. Newsome believed Buhr at the time because she did not appear to be afraid of Griffin. Newsome offered his assistance, which the couple declined. Buhr then helped Griffin clean up the bathroom, putting the bloody towels and Griffin's shirt in the washing machine.

Anthony's labored breathing continued, but Buhr did not call 911 until Anthony was in cardiac arrest. Buhr told the 911 operator that Anthony was not breathing and was having an allergic reaction. When paramedic Joelle Wright ("Wright") arrived, she found Anthony lying on the floor in a diaper with Griffin standing over him. Anthony was taken down to the ambulance. Wright had been informed that Anthony had had an allergic reaction, but when she began Anthony's intubation, she noticed that his airway was not swollen. Wright recalled that Griffin and Buhr were calm.

Newsome was called back to the apartment and arrived as the paramedics were taking Anthony out of the apartment. Griffin told Newsome that Anthony had swallowed a tooth, and Buhr said nothing.

Wright also observed Anthony while he was being treated later in the emergency room. Wright noticed that Anthony had multiple bruises and that he had blood in his diaper and abrasions around his penis and scrotum. Anthony also had a purple scar on his ankle. Wright recalled that when she touched Anthony's face, she felt air, which can be caused when the sinus is broken.

At the hospital, other police officers tried to question Buhr, but each time Griffin would interrupt and speak for her. Griffin told the officers that Anthony had woken him up with his wheezing, that he had called the nurse for advice, and that he had laid on the couch with Anthony to monitor his breathing. Buhr never corrected Griffin's statement. The officers at the hospital also testified that Buhr did not show signs of being distressed by Griffin. Buhr had the opportunity to speak with police, but she never told them that her son had been abused. When Anthony was transported to a different hospital, Griffin was taken into custody for questioning.

Anthony was transported to Children's Mercy Hospital. Emily Reavey ("Reavey") was Anthony's bed nurse at Children's Mercy Hospital. Reavey recalled that Anthony's face, eyes, and lips were very swollen. Anthony was transferred to the intensive care unit where Dr. Tiffany Johnson took over Anthony's case. Dr. Johnson noted that Anthony was unresponsive at that time. Anthony had sustained significant injuries to his mouth, scrotum, penis, and rectal area. Anthony had a hole punctured in his lungs and bruises of different ages all over his body, including areas such as his inner thighs and shoulders, which are rarely injured except in cases of abuse. Anthony was missing a tooth, and his gums were torn. Dr. Johnson noted that Anthony had two separate injuries to his genital area. The tip of Anthony's penis and parts of Anthony's scrotum had been burned recently. Anthony also had an older injury to his scrotum. Dr. Johnson stated that Anthony's scrotum had been hit with such force that a large pool of blood had developed within the scrotal sac, which had produced

enough pressure that the sac burst producing a large hole. Anthony also had a partially healed cigarette burn on the instep of his foot. Dr. Johnson testified that she was certain that Anthony's injuries were inflicted at different times.

Buhr went to the police station and was interviewed by police at around 7:30 a.m. on June 6, 2002. Buhr was asked why she did not notify the nurse hotline service that Anthony was being abused. Buhr responded that "sometimes you don't want it fixed. It's too bad enough that you don't want the doctor to look at it." Buhr also stated that, "she didn't want to end up with Frank again," and that Griffin "helped her get away from Frank." Buhr admitted that she had seen bruises on Anthony's back and buttocks in the past. Buhr was unable to answer whether she loved Griffin or her children more.

Anthony died on June 7, 2002, due to a lack of oxygen to his brain, which was caused by swelling that could have been prevented had he received immediate medical attention after he was injured.

Buhr requested another interview with police on June 7, 2002. Buhr admitted that she had seen large bruises on Anthony's back in March, that she had seen Griffin hit Anthony and William with a belt once, and that she had seen a cut around Anthony's neck "a while back." When Buhr viewed pictures of Anthony taken at the hospital, she admitted that some of his injuries were old and some were new and that she had heard Anthony crying in the background when she had called Griffin from the hospital while visiting her father. Buhr told police that Griffin had never threatened her and that she felt safe talking to the police freely. Buhr also stated that "this is lookin' bad on me already," and "you guys ... are gonna throw me into jail for nuthin'."

Anthony's autopsy was performed by Dr. C. Chase Blanchard on June 8, 2002. Dr. Blanchard noted Anthony's internal anal injuries and stated that they could only have been caused by severe force. Dr. Blanchard also noted that Anthony had both old and new injuries on his head. Anthony's brain was discolored and swollen. Upon observing Anthony's neck muscles, Dr. Blanchard concluded that Anthony had been manually strangled.

Police interviewed Buhr a third time on June 8, 2002. Buhr admitted that Anthony had a scar under his chin that was caused by Griffin, that she had seen bruises on Anthony's back the Tuesday before he died, and that his lips were injured on the Monday before he died but that he was not missing any teeth at that point. Buhr told police that Griffin had told her that he had slipped in the bathroom and pushed a hole in the wall with his elbow, and that he had placed signs in front of the hole. Buhr then accompanied Officer Brent McHenry ("McHenry") to her residence and consented to a search of her apartment. While McHenry was collecting evidence, Buhr handed McHenry a brown belt and a bloody sock that were hidden under her mattress.

Police obtained an arrest warrant for Buhr on June 18, 2002. Buhr was taken to the police station, read her Miranda rights, and interviewed again. Buhr repeatedly said that she did not want to admit anything and that she was scared to say too much because she did not want to implicate herself. Buhr admitted that she lied about her role in helping Griffin clean up the bathroom and about Griffin telling her that he had put his elbow through the bathroom wall. Buhr said that she lied because she was trying to protect herself and that if she did tell the truth, she would end up in jail with Griffin. Buhr also reaffirmed her previous statement that

Griffin had never threatened her or hit her. Buhr admitted that she knew she was not supposed to have unsupervised visits with her children because of the abuse Anthony had suffered in the past. Buhr said, "[s]ee, that's another thing that's goin' to implicate me too ... that I knew that he was doin' this." Buhr also admitted that she knew that Griffin had abused her son the night he was taken to the hospital, that she saw Anthony's blood in the bathroom, and that she saw his genitals that night before she ever called the police. Buhr said that she did not call 911 because she knew the police would respond and she was trying to protect Griffin. Buhr said that she wanted to be with Griffin. Buhr also admitted that she knew that Griffin had kicked Anthony in the scrotum. Buhr said that, "there's a certain point where you go to protect your children and then there's a certain point when you're in a situation where you don't know what to do." Buhr told police that Griffin did not like Anthony and that Griffin targeted Anthony because Anthony could not talk yet. Finally, Buhr admitted that she allowed the abuse and concealed the evidence because she loved Griffin and was afraid of losing him.

Buhr's trial began on January 26, 2004. Following the presentation of the State's case, Buhr filed a motion for judgment of acquittal, which was overruled. Buhr did not present any evidence. After deliberation, the jury returned a guilty verdict on all counts. Buhr filed a second motion for judgment of acquittal, which was also overruled. Buhr was sentenced to a term of thirty years for murder in the second degree, and to terms of four years for each of the remaining four convictions with the sentences to run concurrently.

On appeal, Buhr claims that the trial court erred in overruling her two motions for judgment of acquittal and in sentencing her for Count III, endangering the welfare of a child in the first degree, because the State did not prove beyond a reasonable doubt that Buhr's act of allowing Griffin to have contact with Anthony on or about June 6, 2002, would result in an "actual" risk to Anthony's life, body, or health or that Buhr "knowingly" created that risk. Buhr does not appeal her convictions on the other counts.

## Standard of Review

In a challenge to the sufficiency of evidence at trial, this court's role is limited to a determination of whether the State presented sufficient evidence from which a reasonable trier of fact could have found Buhr guilty beyond a reasonable doubt. *State v. Langdon,* 110 S.W.3d 807, 811 (Mo.banc 2003). A conviction must be based on proof beyond a reasonable doubt of every fact necessary to constitute the crime with which the defendant is charged. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970).

In reviewing a challenge to the sufficiency of evidence, this court views the evidence and all reasonable inferences from the evidence in the light most favorable to the verdict and disregards any evidence and inferences to the contrary. *State v. Belton,* 153 S.W.3d 307, 309 (Mo.banc 2005); *State v. Grim,* 854 S.W.2d 403, 413–14 (Mo.banc 1993). This court neither weighs the evidence, *State v. Edwards,* 116 S.W.3d 511, 545 (Mo.banc 2003), nor determines the credibility of witnesses. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo.banc 1989). It is within the jury's discretion, as the trier of fact, "to believe all, some, or none of the witness' testimony in arriving at [its] verdict." *Id.*

## Argument

Buhr claims on appeal that the trial court erred when it overruled her two

motions for judgment of acquittal. Buhr argues that the State did not prove beyond a reasonable doubt that her act of allowing Griffin to have contact with Anthony on or about June 6, 2002, would result in an "actual risk" to Anthony's life, body, or health or that she knowingly created that risk. We find that there was sufficient evidence to support the jury's conclusion that Buhr's actions on June 6, 2002, resulted in an actual risk to Anthony's life, body, or health. We also find that there was sufficient evidence to support the jury's conclusion that Buhr knowingly created that risk. Thus, the trial court did not err in overruling Buhr's motions for judgment of acquittal. Because there was sufficient evidence for the jury to convict Buhr of this charge, the trial court also did not err in sentencing Buhr for endangerment of a child in the first degree.

Missouri's child endangerment statute provides that "[a] person commits the crime of endangering the welfare of a child in the first degree if: (1) The person knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old[.]" § 568.045.1(1). "A person 'acts knowingly', or with knowledge ... [w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." § 562.016.3(2).

The "Endangering Welfare of Child, 1st Degree" charge against Buhr at issue in this appeal stated that "on or about June 6, 2002, in the County of Jackson, State of Missouri, the defendant knowingly acted in a manner that created a substantial risk to the life and body and health of [Anthony] (DOB 12/01/1998), a child less than seventeen years old, by allowing Bryon Griffin to have contact with [Anthony] after defendant believed that Bryon Griffin had previously physically abused [Anthony]."

### 1. Actual Risk

The State must prove that there was "an actual, as opposed to a potential risk, to the life, body, or health of the child," which is a "fact specific determination and requires an analysis of the facts in each case." *State v. Burrell*, 160 S.W.3d 798, 802 (Mo.banc 2005).

The facts in this case clearly establish that Buhr created a substantial and actual risk to Anthony. Buhr observed the interaction between Griffin and Anthony for a significant period of time. In fact, Griffin and Anthony lived in the same residence intermittently for several months before Anthony's murder. Griffin was left alone with Anthony under his sole supervision on several occasions. Buhr was aware that Griffin was abusing Anthony during this time. In fact, Anthony was taken out of her custody for that specific reason and given to his father. The abuse was so frequent that between February 2002 and June 2002, Anthony: (1) suffered an injury to his testicles that required surgery; (2) underwent three or four more surgeries when the tube that had been inserted into his testicle mysteriously fell out after having been at Griffin's apartment; (3) suffered multiple bruises, black eyes, and missing clumps of hair that were observed by two other parties; (4) was beaten with a belt and cut around his throat as admitted by Buhr; and (5) was tortured and fatally injured on June 6, 2002. Buhr admitted that she knew that Griffin did not like Anthony and that he targeted him for abuse because he could not talk yet. Buhr also admitted that she knew Griffin had injured Anthony on Monday, June 3, 2002, and Tuesday, June 4, 2002, just days before his death.

Buhr tries to distinguish her case from others by pointing out that she was charged for a conduct on or about a specific date as opposed to a range of time.

Buhr argues that this means that the State would have to prove beyond a reasonable doubt that Anthony was practically certain to sustain injury on or about June 6, 2002.

However, in *Burrell*, the Missouri Supreme Court found that there was sufficient evidence of actual risk to the child on the specific date in question, partly because the father was known to have abused the child in the past, and partly because the father had abused the child earlier that day. *Id.* In the present case, Griffin was known to have abused Anthony frequently in the past, including the days leading up to Anthony's death. Buhr also knew that Griffin targeted Anthony and that Griffin was angry when she left Anthony with him while she visited her father in the hospital.

We find that there was sufficient evidence of an actual risk to Anthony on any given day that he was in contact with Griffin, including June 6, 2002. The danger to Anthony did actually exist. It was not a potential risk just because Griffin had the free will to refrain from abusing Anthony when he chose to. Griffin also had the free will to abuse Anthony every day he had contact with Anthony. Buhr admitted that Griffin had injured Anthony on Monday, June 3, 2002, and Tuesday, June 4, 2002, before his death on June 7, 2002. Furthermore, on June 6, 2002, Anthony was at greater risk because Griffin was already agitated as evidenced by Webb's testimony that she heard Griffin and Buhr yelling and fighting before Buhr left the apartment that night and by Buhr's admission that she knew Griffin was angry that night. Buhr also heard Anthony crying in the background when she called Griffin from the hospital while she was visiting her father. There was sufficient evidence for the jury to find that there was an actual risk to Anthony's life, body, or health on or about June 6, 2002.

### 2. Knowledge

Buhr claims that the State did not prove beyond a reasonable doubt that she acted knowingly in creating the risk to Anthony. "A person **'acts knowingly,'** or with knowledge ... [w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." § 562.016.3(2). Therefore, the State must prove that Buhr was aware that her conduct of leaving Anthony with Griffin on or about June 6, 2002, was practically certain to cause substantial risk to Anthony's life, body, or health. In determining whether a person knowingly created a substantial risk, we look to the totality of the circumstances. *Burrell*, 160 S.W.3d at 802. The State can prove knowledge through "direct evidence and reasonable inferences drawn from the circumstances surrounding the incident." *Id.*

There was sufficient evidence for the jury to find that Buhr was aware that her conduct was practically certain to cause substantial risk to Anthony's life, body, or health. The visible appearance of a child can give notice to the parents that their child is being abused or needs medical attention. *State v. Gaver*, 944 S.W.2d 273, 277 (Mo.App. S.D.1997). Anthony had visible bruises, a black eye, and missing clumps of hair that two witnesses noticed in the months before his death. The witnesses testified that these injuries did not start appearing until after Anthony started living with Griffin. Anthony's testicles were injured while at Griffin's apartment in February 2002, and the tube that was later inserted into his testicle mysteriously fell out three or four times while at Griffin's apartment, requiring further surgeries. These injuries put Buhr on notice that her child was being abused. In addition, Buhr later admitted to police that she knew Griffin was abusing Anthony, but she did not report the abuse because she loved

Griffin and did not want him to get into trouble. Buhr admitted to knowledge of other injuries that had not been reported by the other two witnesses. At one point, William and Anthony were removed from Buhr's custody specifically because of the abuse Anthony was suffering. Buhr admitted that Griffin had injured Anthony on June 3, 2002, and June 4, 2002, before his death on June 7, 2002. Buhr also heard Anthony crying when she called Griffin from the hospital where she was visiting her father on June 6, 2002. Buhr should have been aware that there was a substantial risk that Griffin could injure her son at any given time, including June 6, 2002, and that her conduct on that day was practically certain to cause that risk.

It is clear that Buhr was conscious of her guilt. Buhr's statements to the police evidenced that she was afraid of going to jail and afraid of getting Griffin in trouble. Buhr helped Griffin dispose of evidence. Buhr also failed to report the abuse in the months before Anthony's death because she knew it was so severe that she feared getting Griffin in trouble. Buhr failed to report the truth about Anthony's murder to police until June 18, 2002.

### Conclusion

Thus, the jury could have reasonably found Buhr guilty of endangering the welfare of a child in the first degree in violation of section 568.045. There was sufficient evidence for the jury to find beyond a reasonable doubt that Buhr's actions on June 6, 2002, would result in an actual risk to Anthony's life, body, or health and that Buhr knowingly created that risk. For the foregoing reasons, the judgment of the trial court is affirmed.

SMART and NEWTON, JJ., concur.