STATE of Missouri, Plaintiff–
Respondent,

v.

Christy Weatherford COLE,
Defendant–Appellant.

No. SD 31344.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 17, 2012.

Motion for Rehearing and or Transfer
Denied Oct. 9, 2012.

Application for Transfer Denied
Dec. 18, 2012.

Kent Denzel, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and, Richard A. Starnes, Assistant Attorney General, Jefferson City, MO, for Respondent.

DON E. BURRELL, J.

Christy Weatherford Cole ("Defendant") appeals her bench-trial convictions for first-degree endangering the welfare of a child and second-degree murder based upon the perpetration of a felony ("felony murder") related to the April 2003 killing of her three-year-old son ("Child") by her "male friend," Mike Griffin ("Griffin").[1]

---

1. Defendant was previously convicted after a jury trial for endangering the welfare of a

*See* sections 568.045 and 565.021. In two points relied on, Defendant challenges the sufficiency of the evidence supporting each of her convictions, and she also asserts that we should be able to re-weigh the evidence when making our sufficiency determinations. Finding no merit in her first claim, and no authority in support of her second, we affirm.

## Applicable Principles of Review

 We first address Defendant's challenge to our usual standard of review. That standard is the same in a bench-tried criminal case as in a jury-tried case. *State v. Hall,* 201 S.W.3d 599, 602 (Mo.App. S.D.2006). "When the sufficiency of the evidence is challenged in a criminal case, [our] review is limited to whether there is sufficient evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *State v. Pike,* 162 S.W.3d 464, 475–76. (Mo. banc 2005). Defendant's proposed change is in conflict with our high court's directive that we must review the evidence, and the reasonable inferences drawn from it, in the light most favorable to the verdict and disregard all contrary evidence and inferences. *Id.* at 476. While acknowledging this current state of the law, Defendant claims that the existing state of our jurisprudence "is completely backwards." She argues that failing to "apply the 'weight of the evidence' standard in [Defendant's] appeal [provides Defendant], as a criminal defendant, with less stringent review than a civil litigant and therefore denies her equal protection of the law."

Defendant cites no direct authority for her claim that her constitutional rights to due process and equal protection of the law requires us to weigh the evidence in her criminal case. Instead, she analogizes to other decisions, most notably *Jackson v. Indiana,* 406 U.S. 715, 730, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), in which the United States Supreme Court held that subjecting someone charged with a crime to a more lenient mental health commitment standard than that applied in other situations violated the equal protection clause of the Fourteenth Amendment. Defendant's case does not involve differing mental health commitment requirements for civil and criminal cases; it addresses what type of deference must be given to the finder of fact in a criminal case. On that issue, in the context of a state *habeas* case, our highest court recently stated:

> We have said that "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial," *Cavazos v. Smith* [—— U.S. ——], 132 S.Ct. 2, 4 [181 L.Ed.2d 311] (2011) *(per curiam).* The evidence is sufficient to support a conviction whenever, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Parker v. Matthews,* —— U.S. ——, 132 S.Ct. 2148, 2152, 183 L.Ed.2d 32 (2012) (emphasis as stated in original) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

 Appellate review of a bench-tried civil action is governed by the principles

---

child and felony murder in connection with these events, but we reversed those convictions on appeal, finding that the trial court committed plain error by refusing to instruct the jury on the lesser-included offense of second-degree endangering the welfare of a

child—a misdemeanor in the case of a first-offense. *State v. Cole,* 248 S.W.3d 91, 95 (Mo.App. S.D.2008); *see also* section 568.050. (All statutory references are to RSMo 2000). Venue was changed from Ozark to Wright County before the first trial.

articulated in Rule 84.13(d)[2] and *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). We must affirm a civil judgment in a court-tried case "unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *Salem United Methodist Church v. Bottorff*, 138 S.W.3d 788, 789–90 (Mo.App. S.D.2004). These principles of civil appellate review do not apply in a criminal case.[3] *See City of Kansas City v. McGary*, 218 S.W.3d 449, 451 n. 1 (Mo.App. W.D.2006). An appellate court does not engage in a weight-of-the-evidence review in a criminal case. *See State v. Miller*, 499 S.W.2d 496, 499 (Mo. banc 1973); *State v. Goddard*, 34 S.W.3d 436, 438 (Mo.App. W.D.2000); *State v. Colson*, 829 S.W.2d 669, 669 (Mo. App. S.D.1992).

At first glance, it might seem that permitting a weight-of-the-evidence attack on a judgment rendered in a civil case gives a civil litigant some "extra" measure of appellate review not afforded a criminal defendant. But Defendant overlooks the fact that a challenge to the sufficiency of the evidence in a criminal case invokes a review of whether a reasonable fact-finder could have found *beyond a reasonable doubt* that each of the elements of the charged offense occurred—a much higher standard of proof than the preponderance of the evidence standard required in a civil case. *See State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993); *Pike*, 162 S.W.3d at 475–76; *State v. Nash*, 339 S.W.3d 500, 508–09 (Mo. banc 2011).

In *State v. Northern*, 472 S.W.2d 409 (Mo. banc 1971), the defendant contended that it was a violation of his constitutional rights to due process and equal protection for an appellate court to apply different standards of review in bench-tried civil and criminal cases. The heightened burden of proof in a criminal case was the primary basis for our high court's rejection of the challenge:

> Defendant contends we should review the case de novo and that not to do so is an unconstitutional discrimination between civil and criminal litigants in jury-waived cases, and destroys the concept that findings of fact should be examined at least once before they are given any degree of finality. But the Missouri constitution expressly provides the findings of the trial court in a jury-waived criminal case shall have the force and effect of a verdict of a jury, Art. I, Sec. 22(a), V.A.M.S., and so the question on appeal is whether there was substantial evidence to support the finding, *State v. Hatfield* (Mo.Sup.[1971]), 465 S.W.2d 468, 470.

> We do not see why Missouri cannot constitutionally handle appeals in jury-waived criminal trials this way. No discriminating application is made against defendant. If a justification is needed for not having a de novo review of the

---

**2.** Unless otherwise noted, all rule references are to Missouri Court Rules (2012).

**3.** Defendant correctly notes, however, that the *Murphy* standard of review has been cited in a few appeals involving bench-tried criminal cases. *See, e.g., State v. Hawthorne*, 74 S.W.3d 826, 828 (Mo.App. W.D.2002); *State v. Gooden*, 962 S.W.2d 443, 445 (Mo.App. W.D.1998); and *State v. Smith*, 849 S.W.2d 209, 212 (Mo.App. E.D.1993). Despite the citation to *Murphy*, the *Hawthorne* court went on to state that "[t]he reviewing court will not weigh the evidence, but accepts as true all facts and inferences favorable to the verdict and disregards evidence and inferences to the contrary." 74 S.W.3d at 828. And after citing *Murphy* in *Gooden*, the Western District further stated that "[a]ppellate review is limited to whether sufficient evidence was presented from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." 962 S.W.2d at 445.

facts in a jury-waived criminal appeal, it could be found in the different degree of proof required in criminal and civil cases—proof beyond a reasonable doubt as compared to proof by preponderance of the greater weight of the evidence. Facts must be more firmly established in the former to begin with. We note, too, the same limited review prevails in the federal courts on appeals from jury-waived convictions.

*Id.* at 411.

In sum, our supreme court has clearly stated that an appellate court "will not weigh the evidence anew since 'the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case.' " *State v. Freeman,* 269 S.W.3d 422, 425 (Mo. banc 2008) (quoting *State v. Crawford,* 68 S.W.3d 406, 408 (Mo. banc 2002)). We are constitutionally bound to follow that precedent. Mo. Const. art. V, sec. 2; *State v. Merchant,* 363 S.W.3d 65, 69 (Mo.App. E.D.2011). Thus, our "review of the sufficiency of the evidence is limited to whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of the defendant's guilt beyond a reasonable doubt." *Nash,* 339 S.W.3d at 508–09.

### Facts

The evidence as viewed in the light most favorable to the verdicts was as follows. Around 9:30 p.m. on March 23, 2003, Griffin contacted paramedic Steve Duffel at an "ambulance base" in Gainesville, and "told [Duffel that] he had an emergency with a child." Duffel recognized Griffin as a former marshal in Theodosia and past-president of the area's ambulance district. Duffel went to Griffin's vehicle and found Defendant holding Child in the front seat. The paramedic "ascertained that [Child] was not responsive[,]" but he "had a faint carotid pulse." Child also had a lump like "a goose egg on the back of his head[.]"

Defendant told Duffel that Child "slipped and fell in the bathtub." Based on Child's physical appearance, Duffel doubted this explanation because he "had never seen anyone that had fell [sic] from their own height and [suffered] an injury like that." Duffel also observed that Child "was clothed, and he was wearing a diaper. He didn't look particularly clean." Defendant carried Child to the ambulance, which then transported Child to a Gainesville clinic that had a helipad. Child was eventually "air evacuated" to a hospital in Springfield, where he was subsequently removed from life support and died on April 1, 2003.

Dr. Shelley, a pathologist who performed an autopsy on Child, testified that Child had suffered soft-tissue injuries to both sides of his head, suggesting blows to both sides. He also observed a minor bruise "over the shoulder" that he did not think Child could have caused himself. Dr. Shelley concluded that Child died from "[s]evere trauma with hemorrhage and brain necrosis."

Geoffrey Hand, who worked for the Ozark County Sheriff's Department, contacted Defendant at the hospital in Springfield on March 24, 2003. Hand advised Defendant "of her *Miranda* [4] rights[,]" and she agreed to speak with him. Defendant told Hand "that she had been bathing the children in the bathtub. And the children—she had taken the two older children out to dry them off and get them cared for. She heard a noise. And she

4. Presumably a reference to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

returned to the bathtub to find [Child] laying [sic] on the floor outside of the bathtub."

Hand told Defendant that he did not believe her story based upon what he knew about the situation. Defendant then told Hand that Griffin had thrown Child "across the living room floor and into a piece of furniture on the other side of the living room." Defendant told Hand that Griffin "tried to revive [Child], shook [Child], asked [Child]—or stated to [Child], 'You'd better not be playing possum.'" Defendant also told Hand that Griffin struck Child "several times in the chest in an attempt to revive [him]." Defendant indicated that these events took place after Child asked for soda at dinnertime. When Child fussed with Defendant about having the soda, it "apparently upset or angered [Griffin]." Griffin asked Defendant to send Child to him "for disciplinary action, and she sent [Child] to [Griffin] to be disciplined." Defendant told Hand that Child was so upset over not getting a drink that he wet his pants.

Defendant was also interviewed by Jerry Conner, the chief juvenile officer for Ozark County. Defendant told Conner that during dinner, sometime between 7:30 and 8:00 p.m., Child argued with her over having a drink of water or soda before eating dinner. Griffin then got involved in the argument. Conner testified that Defendant told him

that [Griffin] had pulled [Child] to him by his arms and then placed both hands around his neck, laid him face up on [Griffin's] lap, and slammed his head or hit his head two times on the chair arm or the coffee table that was real close to the chair arm. She said after that that [Griffin] threw [Child] on the floor. He hit his head hard on the floor; and his head also hit a coffee table after throwing him.

. . . .

She said after [Child] was thrown on the floor, that [he] was limp. She went to him and picked him up. [Griffin] also went to [Child]. [Defendant] told [Conner] that [Griffin] hit [Child] two to three times in the chest to get his heart going again. And then [Child] was gurgling is what [Defendant] told [Conner]. And [Griffin] had picked [Child] up by his hair, or in the sitting position, and let him go. And he slumped back over.

Defendant told Conner that it took "approximately 15 to 20 minutes" for her to change Child's "pants," "get the other children ready," and leave for Gainesville. Defendant expressed hope that Child would improve, but she also inquired "numerous times" about Griffin's status, including whether he would be released or prosecuted. Defendant's version of the events did not account for a delay of about 40 minutes before she and Griffin arrived at the ambulance base in Gainesville.

Hand spoke with Defendant a second time, and she agreed "to do a reenactment" of the events that had taken place at the house. Hand also learned from Defendant that Griffin "had disciplined the children before and had left some bruises on their necks and chest in the past." Hand understood the injuries to have resulted from Griffin hitting the children with his hands.

██ Another interview and the "reenactment" were led by State Technical Assistance Team investigator Dan Stewart. Stewart died before the second trial began, but a transcript of his testimony from the first trial, a video of Defendant's reenactment, and a statement signed by Defendant were admitted into evidence as Ex-

hibits 8, 9, and 15.[5] Defendant's statement of facts includes that Defendant told Stewart that she had seen Griffin "punch [Child] and [one of the other children] with his fist in the chest, back, and side of the jaw 4 or 5 times when he got mad at them. Sometimes he even knocked them down. [Defendant said she] tried to intervene so that this would not happen."

Patricia Loya was Defendant and Griffin's landlord between February 2002 and February 2003. When Loya visited the home, she often saw Child facing the wall while seated on a potty chair "with the lid closed" and crying because he had wet his diaper. Defendant told her that Child was being punished for wetting his pants. Defendant told Loya on one occasion that she did not believe that Child was her son.[6] Loya had also observed Griffin "screaming and yelling" at Defendant's children.

About a month before Child died, Loya saw the family at a restaurant and observed that Child had "a large bruise on his left cheekbone." Defendant told Loya on that occasion that Child "had fallen down the stairs." A week later, Loya saw Child again; this time the bruise was "larger and darker." Defendant's explanation on this occasion was that Child had fallen while chasing his siblings.

DFS social worker Donley had worked a "family-centered service case on [Defendant] and her children" from January 2002 to October 2002. Donley said she "came into the picture" after the two older children got out of the house at night. In working with the family, Donley "went over goals, made some referrals for them for counseling, [and] went over parenting skills, things of that nature." Defendant told Donley that she had trouble with her children as they had tantrums and behavior problems. Donley recalled, "[Defendant] told me numerous times she was stressed out with the children because of their behaviors."

The State submitted two child-endangerment counts. The first was based on a claim that Defendant had "plac[ed Child] in direct contact with [Griffin], a person whom [D]efendant had previously seen physically abuse [Child], and by so doing, [D]efendant allowed [Child] to be assaulted by [Griffin]." The State also charged that Defendant "acting in concert with another, knowingly act[ed] in a manner that created a substantial risk to the life, body and health of [Child] ... by delaying medical care for [Child] after he was struck by [Griffin] and [Child] became unconscious and non-responsive." Count III, the felony murder charge, alleged that Child was "killed as a result of multiple injuries to his head by means of blunt force trauma inflicted by [Griffin] ... as a result of the perpetration of ... endangering the welfare of a child in the first degree ... as set forth in Count I and/or Count II herein, committed by [Defendant.]"

The trial court found Defendant guilty of endangering a child as charged in count

---

**5.** These exhibits were not deposited with this court. As a result, we presume their contents would be unfavorable to Defendant's claims and "[b]ecause we are unable to review the [exhibits], we cannot conclude there was anything more in the [exhibits] which could change the outcome of the trial." *State v. Hawkins*, 328 S.W.3d 799, 809 n. 3 (Mo.App. S.D.2010). On the other hand, "a statement of fact asserted in one party's brief and conceded as true in the opposing party's brief may be considered as though it appears in the record." *In re Trust of Nitsche*, 46 S.W.3d 682, 684 (Mo.App. S.D.2001).

**6.** Defendant told Wendy Donley, a social worker employed by the Division of Family Services ("DFS"), that Child was born in California, but Defendant believed there had been a "switch at birth" such that Child was not actually her son.

I and "guilty of . . . second-degree murder as charged in Count [III]." The trial court granted Defendant's motion for judgment of acquittal on the Count II child-endangerment charge. On May 10, 2011, the trial court sentenced defendant to 15 months on the child endangerment conviction (with credit for time served) and 15 years on the felony murder conviction.[7] It suspended execution of the felony murder sentence and placed Defendant on a five-year term of probation. This appeal timely followed.

## Analysis

### Point I—Child Endangerment by Placement with Griffin

Defendant's first point contends:

that the evidence was insufficient to establish beyond a reasonable doubt that [Defendant] placed [Child] into physical contact with Griffin,[8] or, even if she did, that placing him in contact with Griffin was practically certain to result in an actual risk to his life, body or health; or that [Defendant] knowingly created that risk, because she could not have been practically certain that Griffin would harm [Child], because while "the potential for harm exists when a victim comes into 'contact' with the person who abused them," such harm is not "practically certain to occur by the contact alone." Griffin had not caused significant harm to [Child] before grabbing him and hitting his head against the chair, and the State did not show that [Defendant] could have anticipated or prevented Griffin's conduct. Further, absent sufficient proof of the underlying

felony, [Defendant's] conviction for felony murder must also be reversed.

We disagree.

■ In relevant part, section 568.045 provides that "[a] person commits the crime of endangering the welfare of a child in the first degree if: (1) [t]he person knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old[.]" "A person 'acts knowingly' . . . [w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." Section 562.016.3(2) (bold typeface omitted). Knowledge may be proven by the evidence and reasonable inferences from the evidence. *State v. Buhr,* 169 S.W.3d 170, 177 (Mo.App. W.D.2005).

■ "The words 'substantial risk' have a plain and ordinary meaning cognizable by a person of ordinary intelligence." *State v. Mahurin,* 799 S.W.2d 840, 842 (Mo. banc 1990). Provided that the determination is supported by evidence, whether particular conduct created a substantial risk to a child's life, body or health is a matter "to be resolved by the fact-finder, in this case, the [trial] court." *State v. Johnson,* 344 S.W.3d 884, 885–86 (Mo.App. E.D.2011). "In determining whether a person knowingly created a substantial risk, we look to the totality of the circumstances." *Buhr,* 169 S.W.3d at 177.

■ Defendant argues the State cannot rely on a theory that Defendant permitted abuse to continue because Defendant was not charged with such behavior. While the offense to be proven is that specified in

---

7. Defense counsel informed the trial court at sentencing that Defendant had been in custody on these charges for 18 months.

8. Defendant apparently intended this assertion to apply exclusively to her against-the-

weight-of-the-evidence challenge as she acknowledges evidence was presented that "[Griffin] asked that [Child] be sent to him for discipline, and [Defendant] did so."

the charge, *see State v. Jackson,* 896 S.W.2d 77, 82 (Mo.App. W.D.1995), "[t]he State need merely allege and prove the act which gives rise to the risk." *State v. Todd,* 183 S.W.3d 273, 277 (Mo.App. W.D. 2005). Defendant contends there was no showing that "[Defendant] was aware that [Child's] contact with Griffin on [the charged offense] date was practically certain to result in abuse." But it is the practical certainty of the *risk* of harm that the State must prove, not that actual abuse is practically certain to result. "[T]here must be an actual risk to the life, body, or health of a child .... [but] harm to the child does not have to occur to trigger application of the statute." *State v. Manwarren,* 139 S.W.3d 267, 271 (Mo.App. S.D. 2004).

■ Defendant cites *State v. Wilson,* 920 S.W.2d 177 (Mo.App. W.D.1996), for its statement that "[t]he criminal statutes for child endangerment are meant to apply to situations where a parent creates an actual risk to the life, body, or health of a child. They are not meant to apply to situations where there is only the potential for risk to the health of the child." *Id.* at 180. But in *Wilson,* the Western District found that "there was no evidence presented that [the child] had injuries which, without medical treatment, would have created a substantial risk to her health" and therefore the defendant's failure to seek medical care did not endanger the child. *Id.* at 181. The court in *Wilson* thereby determined that there was, in fact, no substantial risk to the child's life, body or health. Here, the evidence was that Defendant exposed Child to a person she knew had previously injured Child while disciplining him or on occasions when Griffin was angry with Child. This evidence demonstrated the existence of a substantial risk, not a "potential" risk.

Defendant also relies on *Carmons v. State,* 26 S.W.3d 382 (Mo.App. W.D.2000), as illustrating the inadequacy of a potential risk. *Carmons* was a post-conviction case that set aside a guilty plea because a sufficient factual basis for the plea was not established. *Id.* at 383. That factual basis was deemed insufficient because it did not reveal the circumstances under which the mother at issue had permitted her child to have contact with someone who had been previously identified as having sexually abused the child. *Id.* at 385. The Western District stated that "while the failure to act may subject an individual to prosecution for child endangerment, in such cases the failure to act must pose an actual or 'practically certain' risk or danger and not just the potential for risk or danger." *Id.* Without a record of the circumstances surrounding the charged event, the court noted that "[w]hile we recognize that the potential for harm exists when a victim comes into 'contact' with the person who abused them, we cannot say that harm would occur or would be practically certain to occur by the contact alone." *Id.* Here, the evidence adduced at trial included Griffin's prior interactions with Child and the circumstances surrounding Defendant's decision to put Child in contact with Griffin on the charged date.

The State argues that *State v. Burrell,* 160 S.W.3d 798 (Mo. banc 2005), is the controlling case. In *Burrell,* a mother was charged with child endangerment by placing her child "in direct contact with" someone she had previously witnessed abusing the child. *Id.* at 802. Under the circumstances of that case, our high court found that "[the m]other's act of placing [the child] in contact with [the father] on [the date charged] resulted in a substantial risk of harm to [the child]." *Id.* Those circumstances were that the father's abuse of the child started with hard slaps on the butt about a year earlier and then escalated to

punching and kicking. *Id.* DFS had been called three times, but because the child's injuries had healed before two of the visits, no charges were filed against the father. *Id.* The father had abused the child in the mother's presence earlier in the same day on which the charged conduct was alleged to have occurred. *Id.* After the first instance of abuse that day, "[the f]ather continued the abuse by slapping and kicking [the child] when he would not wake." *Id.* The Court also found that the mother had acted knowingly when she admitted being aware of the father's escalating abuse and said that she had been "unable to stop him on several occasions because he would then hit her." *Id.* at 803. From this evidence, the Court held that the fact-finder could reasonably infer that, as the child's primary caregiver, the mother knew of the past injuries and thereby knowingly subjected the child to a substantial risk of harm. *Id.*

Defendant does correctly note that the evidence of previous abuse in *Burrell* was more severe than the evidence of previous abuse in the instant case. She then insists that this difference establishes that her putting Child in contact with Griffin did not pose a substantial risk to Child. But she reaches this conclusion by weighing the evidence supporting the verdict against other testimony that the trial judge could have—but apparently didn't—believe.[9] For the reasons previously given, we cannot engage in such re-weighing and will proceed to Mother's alternative claim that

"[e]ven taking the evidence in the light most favorable to the verdict does not lead to a conclusion that [Defendant] created an actual, rather than potential, risk."[10]

As earlier noted, *Burrell* does contradict the proposition that the State was required to prove that Defendant knew Griffin would abuse Child so severely as to kill him in order to prove her guilty of child endangerment; the State's burden was to prove that Defendant knew there was a substantial risk that Griffin would harm Child's life, body or health if she provided Child to Griffin for discipline on the charged date. Unlike *Carmons*, where the other circumstances surrounding the contact were not stated, 26 S.W.3d at 385, the evidence here demonstrated that Mother did more than merely allow contact between Child and Griffin.

■■■ Here, Defendant did so knowing that Griffin had previously hit Child and a sibling on their bodies and faces on four or five other occasions, sometimes knocking them down. The trial court could also credit Hand's testimony that Defendant had seen Griffin previously bruise the children's necks and chests while disciplining them. Defendant—knowing of Griffin's previous acts of violence toward the children and that Griffin was upset or angry when he asked for Child to be sent to him for discipline—nonetheless complied with Griffin's request. The trial court could also reasonably infer that Defendant's sub-

9. The other evidence included the DFS worker's testimony that she "didn't observe anything when [she] was there to make [her] think that [Griffin] ... was going to do anything harmful" and the pathologist's description of the other marks on Child, in addition to the head injury and the bruise on the shoulder, as "the kind of bumps and scrapes you would see in the play of a rambunctious little boy." Defendant also presented the testimony of a woman who had known Defendant since she was a little girl, the Sunday school teacher for two of her children, and her pastor. They testified that they didn't see suspicious bruises on Child, and that Defendant acted appropriately in response to other incidents involving the children.

10. The use of terms like "actual" risk and "potential" risk do not advance Defendant's argument; the statute requires proof of a "substantial risk."

sequent actions in changing Child's clothes and initially claiming that Child had hurt himself during a bath were not just an attempt to protect Griffin; it could infer that they were also an attempt to hide her own culpable actions. *See State v. Rodden*, 728 S.W.2d 212, 219 (Mo. banc 1987) (false exculpatory statements show "a consciousness of guilt").

Viewing the evidence in the light most favorable to the verdict, the trial court could find beyond a reasonable doubt that sending Child to Griffin for discipline on the charged date was practically certain to result in a substantial risk to Child's life, body, or health. *Cf. State v. Buhr*, 169 S.W.3d 170, 177 (Mo.App. W.D.2005) (sufficient evidence of actual risk on date charged where mother knew of past abuse and perpetrator was angry when mother left child with him). Point I is denied.

### *Point II—Felony Murder*

Defendant's second point contends the trial court erred in denying her motion for judgment of acquittal on the felony murder charge because "the State failed to prove beyond a reasonable doubt that [Defendant's] act of 'placing [Child]' into 'direct contact' with Griffin was the proximate cause of his death." It asserts that "Griffin's actions were an intervening cause of [Child's] death, which was not a direct, natural or reasonably foreseeable consequence of [Defendant's] action in allowing [Child] to have contact with Griffin." We disagree.

█ As relevant here, section 565.021 provides that "[a] person commits the crime of murder in the second degree if he: ... (2) [c]ommits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony ... another person is killed as a result of the perpetration or attempted perpetration of such felony[.]"

Missouri follows the foreseeability-proximate cause theory of felony murder in interpreting whether a death resulted from the perpetration of a felony. *O'Neal* [*v. State*], 236 S.W.3d [91,] 96 [ (Mo.App. E.D.2007) ]. Under that theory, the identity of the actual killer is irrelevant and a defendant may be considered responsible for any deaths that are the natural and proximate result of the commission of a felony.

*State v. Stallman*, 289 S.W.3d 776, 779 (Mo.App. E.D.2009).

█ "Conviction for second degree felony murder does not require any intent to kill. It requires a showing that death occurred as a result of perpetration or attempted perpetration of a felony." *State v. Akins*, 829 S.W.2d 619, 620–21 (Mo.App. E.D.1992). The State did not have to prove that Defendant actually foresaw Child's death while committing the underlying felony of child endangerment; the relevant question is whether Child's death was a reasonably foreseeable consequence of her perpetration of the underlying felony. *See, e.g., Stallman*, 289 S.W.3d at 779 (holding that it was reasonably foreseeable that a robbery would result in a pursuit and manhunt "and that these crimes would set into motion the chain of events that caused [the responding officer's] death" in a vehicle crash); *Akins*, 829 S.W.2d at 621 (holding defendant responsible for the victim's death by a stress-induced heart-attack that resulted from a robbery); *State v. Blunt*, 863 S.W.2d 370, 372 (Mo.App. E.D.1993) (it was foreseeable that a drug deal could result in a death); and *cf. State v. Russell*, 780 S.W.2d 126, 127–28 (Mo. App. E.D.1989) (holding the defendant responsible for the victim's death by smoke inhalation resulting from an arson where the defendant was found guilty of robbery, not-guilty of arson, and it was the defendant's accomplices, not the defendant, who

burned the premises after the robbery was completed).

In *Burrell,* our supreme court stated as follows the proximate cause requirement for felony murder based on child endangerment:

A person is guilty of second-degree murder if she commits any felony and, in the perpetration of that felony, another person is killed as a result of the perpetration of that felony. Sec. 565.021.1(2). Under Missouri law, a defendant is responsible for any deaths that are the natural and proximate result of the commission of the felony. *State v. Black,* 50 S.W.3d 778, 785 (Mo. banc 2001); *State v. Blunt,* 863 S.W.2d 370, 371 (Mo.App.1993). An independent, intervening cause, however, can relieve a defendant from criminal responsibility for the death.

160 S.W.3d at 803. Defendant Burrell made the same argument that Defendant asserts here; she insisted that "the actions of [the father in beating the child] were an independent, intervening cause of [the child's] death. She further argue[d] that [the child's] death was not a direct, natural, or reasonably foreseeable consequence of her actions in allowing him to have contact with [the father]." *Id.* Our high court rejected that argument, holding that

[t]he evidence establishes the continuing abuse to [the child] and the clear causal relation between [the mother's] conduct in placing [the child] in contact with [the father], refusing to seek timely medical attention, and the death of [the child]. [The father's] actions in abusing [the child] were not an independent, intervening cause of [the child's] death that would relieve [the mother] of criminal responsibility. [The child's] death was the foreseeable result of [the mother's] actions. Under these circumstances, there was sufficient evidence to find [the mother] guilty of second-degree murder.

*Id.* And although the prior abuse in *Burrell* was more severe than that proven in the instant case, and Defendant was acquitted of child endangerment based on an alleged failure to timely seek medical care, the causal relationship between the felony child endangerment perpetrated by each mother and each child's resulting death was the same.

As in *Burrell,* Defendant knowingly risked bodily harm to Child by her act of endangerment, and Child paid the ultimate price when that substantial risk ripened into a deadly result. In other words, there was an uninterrupted, "clear causal link" between Defendant's decision to deliver Child to Griffin for discipline and Child's resulting death. Contrary to Defendant's claim, Griffin was the mechanism of that reasonably foreseeable harm, not some independent, intervening actor. Defendant's description to officers of the brutal beating Child suffered when she sent Child to Griffin, along with the pathologist's testimony that the cause of Child's death was "[s]evere trauma with hemorrhage and brain necrosis[,]" established that Defendant's decision to place Child in Griffin's control under the circumstances in existence at that time was the proximate cause of Child's death.

Defendant's second point is also denied, and the judgment is affirmed.

JEFFREY W. BATES, J. and DANIEL E. SCOTT, P.J., concur.