APPENDIX

STATE of Missouri, Respondent,

v.

Linda DAILEY, Appellant.

No. 53407.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 14, 1988.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 20, 1988.

Application to Transfer Denied
Sept. 13, 1988.

Henry Robertson, St. Louis, for appellant.

George A. Peach, Dee Joyce–Hayes, St. Louis, for respondent.

GRIMM, Judge.

In this jury tried case, defendant was convicted of endangering the welfare of a child, in violation of § 568.050, RSMo. 1986. Her appeal raises one issue, whether the trial court erred in overruling defendant's motion for judgment of acquittal on the basis that there was insufficient evidence to support the conviction. Finding that there was sufficient evidence, we affirm.

The defendant, mother of the victim Jerrell Sims, was tried jointly with Cleveland Sims, the admitted father of the victim. They were both charged with assault in the first degree (§ 565.050, RSMo. 1986). Defendant was also charged with endangering the welfare of a child "by failing to seek adequate medical attention for the child's injuries, and by providing misleading information to medical personnel on the childs [sic] condition and treatment." Although Sims was also charged with endangering the welfare of a child, the allegation was confined to "failing to seek adequate attention for the child's injuries." The jury acquitted both defendant and Sims of the assault charge. However, each was found guilty of endangering the welfare of a child and punishment was assessed at a fine of $1000 each. On appeal, the conviction of Sims was reversed. *State v. Sims,* 746 S.W.2d 157 (Mo.App.E.D.1988).

In assessing a sufficiency of the evidence challenge, the evidence, together with all reasonable inferences which may be drawn from it, is viewed in the light most favorable to the verdict. Evidence and inferences contrary to the verdict are ignored. *State v. Mallett,* 732 S.W.2d 527, 530 (Mo. banc 1987).

Jerrell was born on September 24, 1985. His parents were not married. They lived in a two-family residence; defendant and Jerrell in the downstairs apartment, Sims in the upstairs apartment with his mother. The parents were the sole custodians of Jerrell.

On Thursday evening, November 7, 1985, Sims dropped Jerrell while trying to take him out of the car. The baby landed face first on the concrete. The next morning, defendant took Jerrell to Yateman Clinic, a free clinic near her home. There, the medical record indicates, the clinic was advised "Father dropped infant yesterday on ground from car. No scars. No loss of consciousness. Eating, crying and sleeping." The clinic's x-ray machine was not working that day, thus x-rays could not be taken. However, defendant was told to return to the clinic on Tuesday, November 12, to see Dr. Carmona for skull films. Defendant did not return on November 12 to have the x-rays taken. In fact, Yateman Clinic records indicate the next time they saw the baby was December 12. At that time, mother took Jerrell to the clinic because the baby was vomiting, had a fever, and was crying most of the day. The medical records reflect that the pediatric nurse at the clinic was told "Skull x-rays at Children's [Hospital] last month." Clinic per-

sonnel concluded that the baby was dehydrated and had an inguinal hernia, so the baby was sent to Children's Hospital.

Records at Children's Hospital indicated that they first saw Jerrell on November 1 for a rash. No x-rays were taken. The next time the baby was at Children's Hospital was on December 12, when the child was admitted for dehydration.

Following admission to the hospital on the 12th, the child was under the care of Dr. Thomas Hines, a pediatric resident. The child was treated for dehydration. Dr. Hines noted that the child was quite irritable; when touched, the baby would stiffen, arch his back, and cry. This was unusual for a dehydrated baby. Because of this, and searching for a reason for the source of the irritability, a chest x-ray was taken. That x-ray disclosed multiple rib fractures. As a result of that finding, additional x-rays were ordered. A skull x-ray raised a question of a skull fracture. An x-ray of the left arm indicated a fracture of the left wrist. Because of these findings, Dr. Hines called the defendant on December 15 to see if she was aware of any injury that could account for the fractures. She mentioned the incident of Sims dropping Jerrell on November 7. Defendant told Dr. Hines that "she'd taken Jerrell to the doctor within the next day or so and that x-ray was taken and he was okay." The only other explanation defendant gave for the injuries was that possibly they had occurred when Jerrell was born. The next day, further x-rays showed a fracture of the left thigh bone, left big toe, and right lower leg, as well as a fracture on each side of the skull.

Dr. William McAlister, a pediatric radiologist at Children's Hospital, said that Jerrell had at least eleven fractures. These fractures were in at least three stages of healing, indicating that one or more of the fractures had occurred on at least three different occasions.

■ Section 568.050 provides that a "person commits the crime of endangering the welfare of a child if he knowingly acts in a manner that creates a substantial risk to the life, body or health of a child less than seventeen years old." Here, the evidence indicates that on November 7, Jerrell was dropped face down on concrete; defendant took Jerrell to the Yateman Clinic the next day for an examination, but due to a breakdown of equipment, was told to return Tuesday for a skull x-ray. Defendant did not have the baby's skull x-rayed. Failure to do so, following such a fall and when directed to do so by medical personnel, created a substantial risk to Jerrell's health.

■ Further, defendant, on December 12, told the pediatric nurse at Yateman Clinic that skull x-rays had been obtained at Children's Hospital in November. Three days later, the defendant told Dr. Hines that following the November 7 drop of Jerrell, that an "x-ray was taken and he was okay." It has long been the rule that if a jury is satisfied that statements are false, it had "the right, not only to take such statements into consideration, in connection with all the other circumstances of the case, in determining whether or not defendant's conduct had been satisfactorily explained by [her] upon the theory of [her] innocence, but also to regard false statements in explanation or defense ... as in themselves tending to show guilt." *Wilson v. United States*, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090 (1896). Exculpatory statements, when proven false, evidence a consciousness of guilt and therefore bear directly on the issue of guilt or innocence. *State v. Rodden*, 728 S.W.2d 212, 219 (Mo. banc 1987). In this case, defendant's two statements that she had skull x-rays taken, when in fact she had not, was evidence of consciousness of guilt. *See, State v. Ross*, 606 S.W.2d 416, 425 (Mo.App.E.D.1980).

In view of all the evidence, we conclude it was sufficient to support a finding that

defendant knowingly failed to obtain adequate medical attention by failing to secure skull x-rays of Jerrell, thereby creating a substantial risk to his health. Therefore, the court did not err in submitting this charge to the jury.

The judgment is affirmed.

SIMON, P.J., and CRANDALL, J., concur.