**STATE of Missouri, Respondent,**

v.

**Melissa WILSON, Appellant.**

**No. WD 50689.**

Missouri Court of Appeals,
Western District.

April 23, 1996.

Rose M. Wibbenmeyer, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Karen C. Nelson, Assistant Attorney General, Jefferson City, for respondent.

Before ULRICH, P.J., and BRECKENRIDGE and SMITH, JJ.

BRECKENRIDGE, Judge.

Melissa Wilson appeals her conviction of the class D felony of endangering the welfare of a child in the first degree, § 568.045, RSMo Cum.Supp.1993. Ms. Wilson contends

that there was insufficient evidence to support the conviction, and that the trial court committed plain error by allowing the prosecutor to make allegedly improper remarks during closing argument.

The judgment of the trial court is reversed.

As this case involves a challenge to the sufficiency of the evidence, this court reviews the evidence in the light most favorable to the State, including all reasonable inferences drawn therefrom, and disregards all evidence and inferences to the contrary. *State v. Neal,* 849 S.W.2d 250, 253 (Mo.App.1993).

In 1993, Ms. Wilson and her two children, two-year-old Victoria and one-year-old Jessica, lived with Ms. Wilson's boyfriend, Steven Bentch. On the evening of August 17, 1993, Victoria was left in the care of Ms. Wilson's parents, William and Gloria Wilson. Around 11:15 p.m., Victoria became incoherent, sweaty, and pale, and Mr. Wilson called an ambulance.

Victoria was transported to Moberly Regional Medical Center. Ms. Wilson was informed of the emergency and arrived at the hospital forty-five minutes later. At that time, hospital personnel were taking photographs of injuries which Victoria had sustained to her ear, feet, and back. Ms. Wilson became upset that the photographs were being taken, and the attending physician asked Ms. Wilson how the injuries occurred.

Ms. Wilson responded that the injury to Victoria's ear was caused by a fall out of a cot, that the injuries to her feet were caused by wearing shoes without stockings, and that the injury to her back was caused by slipping on a porch step. The attending physician was not satisfied by Ms. Wilson's explanation, and ordered the child taken to Columbia Medical Center for further examination. There, Ms. Wilson offered the same explanation for Victoria's injuries. Victoria remained in the hospital for three or four days, and was then returned to Ms. Wilson's custody.

William and Gloria Wilson had limited contact with Victoria between August 17 and September 28, 1993, because Mr. Bentch told them to stay away. Then, on September 29th, Ms. Wilson telephoned her mother and said she wanted to come home because she was ill and Mr. Bentch would not allow her to go to the doctor. After Ms. Wilson and her two children arrived at her parents' home, Ms. Wilson's mother noticed that Victoria's face was black and blue. Victoria also had injuries on her toes, fingers, back, buttocks, and some of the hair on the back of her head had been pulled out.

Upon seeing Victoria's condition, Ms. Wilson's mother called the police. Ms. Wilson told her mother that Mr. Bentch had caused Victoria's injuries, and that he had hit Victoria in the face with his hand. Ms. Wilson also told her mother that Victoria's hair had been pulled out by one-year-old Jessica, but when her mother doubted that explanation, Ms. Wilson said that Mr. Bentch had told her that Victoria's hair had come out while he was brushing it. In addition, Ms. Wilson twice told her mother that she had lied to the medical authorities to keep Steven Bentch from being arrested.

Officer William Hall of the Randolph County Sheriff's Department interviewed Ms. Wilson at her parents' house. She told him that Mr. Bentch had caused Victoria's injuries. Ms. Wilson also told Officer Hall that Mr. Bentch bit Victoria's fingers and toes, and that Mr. Bentch would wipe Victoria's face in her soiled pants and force Victoria to wear the pants on her head.

In addition, Ms. Wilson told Officer Hall that this was not the first time that Mr. Bentch had inflicted injuries on Victoria. Ms. Wilson also confirmed that she had lied to the doctors in Moberly and Columbia because she did not want Mr. Bentch to get into trouble.

Shelia Dollens, a social worker with the Missouri Division of Family Services, interviewed Ms. Wilson on the same day. Ms. Wilson told Ms. Dollens that she had seen Mr. Bentch punch, bite, yell and curse at Victoria, and that Mr. Bentch had also slapped and pinched the child. Ms. Wilson also told Ms. Dollens that she had seen Mr. Bentch grab Victoria by her hair and pull or drag her. Ms. Dollens' records indicated that, between August 17 and September 28,

1993, there had been four contacts between DFS and Ms. Wilson, and Ms. Wilson had not advised DFS that her daughter was being abused.

After Officer Hall and Ms. Dollens obtained information from family members, Officer Hall, Ms. Wilson and her two children went to the hospital, where Victoria was given a physical examination. At trial, Ms. Wilson acknowledged that it was not her idea to take Victoria to the hospital. She testified that they went to the hospital because one of the people investigating the incident told her that Victoria needed to be "checked out."

Hospital personnel recommended that Victoria be taken to the medical facility at the University of Missouri to have a SAFE examination, as well as a physical examination and x-rays. These procedures were done. Apart from the aforementioned examinations, Victoria did not require medical treatment for her injuries. There was also evidence that Victoria received psychological counseling.

In a complaint filed on February 14, 1994, Ms. Wilson was charged with one count of the class D felony of endangering the welfare of a child in the first degree, § 568.045. The complaint alleged that on or about the 29th of September, 1993, Ms. Wilson committed the crime by "failing to obtain or provide medical care for Victoria Wilson for recently sustained injuries inflicted upon Victoria Wilson by another, on or about the 28th day of September, 1993."

The complaint also charged Ms. Wilson with one count of hindering the prosecution of Mr. Bentch for child abuse by making false statements on August 17, 1993. At the close of the evidence, the hindering prosecution count was dismissed by the trial court, and Ms. Wilson was convicted by the jury of the endangerment count. Ms. Wilson was sentenced to a five-year term of imprisonment and assessed a $1,000.00 fine. The execution of the prison sentence was suspended, and Ms. Wilson was placed on probation for a term of five years.

In her first point on appeal, Ms. Wilson contends that the trial court erred by denying her motions for acquittal because there was insufficient evidence to support her conviction.[1] Ms. Wilson argues that, because Victoria did not require medical treatment after her arrival at the hospital on September 29, 1993, Ms. Wilson's failure to seek such treatment could not have resulted in a substantial risk to Victoria's life, body, or health. In considering Ms. Wilson's claim, this court is limited to determining whether the jury had substantial evidence from which to find Ms. Wilson guilty beyond a reasonable doubt. *Neal,* 849 S.W.2d at 253.

Under § 568.045, one is guilty of endangering the welfare of a child in the first degree if he or she "knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old." Failure to provide medical treatment can constitute endangerment of the welfare of a child. *State v. Dailey,* 755 S.W.2d 348, 350 (Mo.App.1988).

In *Dailey,* the Eastern District of this court found sufficient evidence to support a mother's conviction for endangering the welfare of her child, when the mother failed to obtain a skull x-ray after her six-week-old child was dropped face first onto a concrete driveway. *Id.* at 350–51. "Failure to do so, following such a fall and when directed to do so by medical personnel, created a substantial risk to [the baby's] health." *Id.* at 350. When x-rays were obtained they revealed that the child had a fracture on each side of his skull, multiple rib fractures, and fractures of the left wrist, left thigh bone, left big toe and right lower leg, totaling at least eleven fractures in all. *Id.*

In *Dailey,* serious injuries were discovered when the child was examined and, considering the nature of the injuries, there is a reasonable inference that substantial risk to the child's health resulted from failure to obtain medical treatment. Here, although Veronica had multiple bruises and injuries to

1. Because Ms. Wilson introduced evidence on her own behalf after her motion for judgment of acquittal at the close of the State's case was denied, this court only reviews her motion for judgment of acquittal at the close of all of the evidence. *State v. Bragg,* 867 S.W.2d 284, 289 (Mo.App.1993).

her fingers and toes from bites, there was no evidence that the medical examination disclosed any injury or condition requiring medical treatment.

The question here is whether the terms "substantial risk to the life, body or health of a child" in § 568.045 encompass the situation where a child is injured, but upon a medical examination is found to have no injury sufficiently serious to require medical treatment. Other jurisdictions, with similar statutory language, have defined the parameters of the crime of endangerment of the welfare of a child. This court looks to those cases for guidance.

The Indiana courts have determined that endangering means "to bring into danger," and to commit such a crime a defendant must expose the child to a danger which is actual and appreciable. *State v. Downey*, 476 N.E.2d 121, 123 (Ind.1985). It is clear that, if a child was in actual need of certain medical treatments and a parent failed to obtain treatment which was necessary to prevent harm to the life, body or health of a child, then the parent exposed the child to an actual danger, and thus the parent created a substantial risk to the life, body, or health of the child. The fact that the failure to provide medical treatment creates a risk to the child may be established by expert testimony. *Sample v. State*, 601 N.E.2d 457, 460 (Ind.App.1992); *Johnson v. State*, 555 N.E.2d 1362, 1366 (Ind.App.1990).

Where an actual risk to the child for failure to provide medical treatment exists, a parent can be held criminally liable for failing to seek such treatment even though the failure did not result in any harm to the child. *Sample*, 601 N.E.2d at 460; *Johnson*, 555 N.E.2d at 1366. To require that such a failure result in harm before imposing criminal liability would mean that "the legislature intended to engage in a roulette game whereby conduct or inaction with respect to the care of a child, albeit heedless or neglectful, could continue unchecked so long as it did not happen to harm the child." *Johnson*, 555 N.E.2d at 1366.

In *Johnson*, *id.* at 1364, the caretakers of a child who was scalded in a bathtub did not seek medical treatment until the next day. The child was diagnosed with first, second, and third degree burns over twenty percent of her body and, "although no great harm actually came to [the child] as a result of the delay in seeking medical treatment, there was a potential for harm arising from the delay due to a serious risk of infection." *Id.* Likewise, in *Sample*, 601 N.E.2d at 460, the court upheld the conviction of a mother who failed to seek medical treatment for her child after the child received a bump to her head, resulting in a skull fracture and swelling. The injury to the child's skull was sufficiently serious that it posed "a strong possibility" of a significant and potentially life threatening injury to the baby's brain underneath the fracture, and the first twenty-four hours after the injury were when the vast majority of complications were likely to occur. *Id.*

But there is a fundamental difference between a situation where the harm never actually occurred, and a situation where the danger itself never actually existed, as is the case when it is determined that the child did not have an illness or injury which created a risk to the life, body or health of the child without medical treatment. The criminal statutes for child endangerment are meant to apply to situations where a parent creates an actual risk to the life, body, or health of a child. They are not meant to apply to situations where there is only the potential for risk to the health of the child. *See Downey*, 476 N.E.2d at 123. Thus the child must have an illness or injury which needs treatment to avoid harm to life, body or health; only then can a failure to provide such treatment constitute an actual risk or danger. *See Ricketts v. State*, 598 N.E.2d 597, 601 (Ind.App. 1992) (evidence of "malnutrition", in and of itself, does not prove the child's health is at risk, because malnutrition may simply imply poor or unbalanced nutrition as opposed to undernourishment that endangers a child's health).

In *People v. Berg*, 171 Ill.App.3d 316, 121 Ill.Dec. 515, 525 N.E.2d 573 (1988), the Illinois appellate court reversed a conviction for endangering the health of a child for failure to obtain medical treatment on facts very similar to those here. The police were notified that a minor child had bruises on her

face. The child was taken to the hospital where an examination revealed a rib fracture, "multiple bruises on the minor's back and face, disruption to her primary teeth, broken nails on her big toes and multiple breaks in the hair shafts of her scalp." *Id.* 121 Ill.Dec. at 516, 525 N.E.2d at 574. Tests done on the child's bruises proved negative and no medical treatment was provided. The court found that the State failed to prove that the defendant, who lived with the child and her mother, endangered the child's health by not obtaining medical treatment, when no medical treatment was required and no evidence showed the child's health was endangered or adversely affected by the failure to seek medical attention. *Id.* 121 Ill. Dec. at 518, 525 N.E.2d at 576.

Without the requirement that there be an actual danger posed by an illness or injury to a child, a parent could be convicted of a criminal act in the wake of an illness or injury which merely suggests the possibility of a need for medical treatment. Risk to the child must not only be appreciable, it must be actual. The requirement of actual danger is necessary to draw a line "between trivial and substantial things so that erratic arrests and convictions for trivial acts and omissions will not occur." *Downey,* 476 N.E.2d at 123.

■ The State argues in its brief that there was evidence that Victoria did require medical treatment in that she received counseling following the trip to the hospital on September 29, 1993. The evidence concerning counseling came from Gloria Wilson's testimony as follows:

Q. Has Victoria required counseling?

A. Yes, she has.

Q. Done by a psychiatrist or psychologist?

A. Done by a therapist.

Q. She has seen a therapist?

A. Yes.

Q. And received treatment from him?

A. Yes.

Because this evidence does not relate Victoria's need for counseling to a particular cause or time frame, this court need not reach the issue of whether psychological counseling can constitute medical treatment in the context of the crime of endangering the health of a child for failure to obtain medical treatment. The reference to counseling in the record is not sufficient evidence to support Ms. Wilson's conviction for endangerment of a child.

Consequently, there was no evidence presented that Victoria had injuries which, without medical treatment, would have created a substantial risk to her health on September 29, 1993. Therefore, Ms. Wilson's failure to seek medical treatment on that date did not, as charged in the information, constitute endangering the welfare of a child in the first degree. *See Berg,* 121 Ill.Dec. at 518, 525 N.E.2d at 576. Ms. Wilson's conviction is reversed.[2]

In her second point on appeal, Ms. Wilson claims that the trial court committed plain error by failing to *sua sponte* order a mistrial in response to allegedly improper remarks made during the prosecutor's closing argument. Because Ms. Wilson's first point is dispositive of this appeal, it is unnecessary to address her second point.

■ In light of this court's conclusion that the trial court should have sustained Ms. Wilson's motion for a judgment of acquittal, her conviction is reversed without remand. *State v. West,* 559 S.W.2d 282, 285 (Mo.App. 1977).

All concur.

---

2. Although the evidence does not establish Ms. Wilson's guilt under § 568.045 for the failure to provide medical treatment, evidence that she knew or should have known Mr. Bentch was committing severe or recurrent acts of physical abuse toward Victoria may support termination of her parental rights. § 211.447.2(2)(c). *See* *also In Interest of D.O.,* 806 S.W.2d 162, 166 (Mo.App.1991). Also, it is arguable that Ms. Wilson is guilty of endangering the welfare of Victoria in violation of § 568.045 for knowingly permitting Victoria to be abused, but this court is not aware of any cases which have considered this application of § 568.045.