

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| KRYSTAL M. SCROGGS, | ) | |
| | ) | |
| Appellant, | ) | WD84643 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | November 1, 2022 |
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Johnson County, Missouri**
The Honorable R. Michael Wagner, Judge

Before Division Four: Gary D. Witt, Chief Judge, Presiding, Mark D. Pfeiffer, Judge, and
Louis Angles, Special Judge

Krystal Scroggs ("Scroggs") appeals the judgment of the Circuit Court of Johnson

County ("motion court"), following an evidentiary hearing, denying Scroggs's amended

motion to vacate, set aside, or correct the judgment and sentence, pursuant to Rule 29.15.[1]

On appeal, Scroggs argues the motion court erred in denying her amended motion because

(1) Scroggs's appellate counsel ("appellate counsel") was ineffective in failing to raise a

sufficiency of the evidence challenge to first-degree child endangerment on direct appeal

---

[1] All rule references are to Missouri Supreme Court Rules (2021), unless otherwise indicated.

because the State failed to produce sufficient evidence that Scroggs "created" a substantial risk to the health of the baby ("M.J.S.");[2] (2) appellate counsel was ineffective in failing to raise a sufficiency of the evidence challenge to felony murder on direct appeal because the State failed to produce sufficient evidence to support felony murder predicated on child endangerment; (3) appellate counsel was ineffective in failing to raise a sufficiency of the evidence challenge to abandonment of a corpse because there was insufficient evidence that Scroggs and her husband, Matthew Scroggs ("Matthew"),[3] "disposed" of M.J.S.'s body because they never relinquished possession of it; and (4) Scroggs's trial counsel ("trial counsel") was ineffective in failing to object and offer an additional element to the abandonment of a corpse verdict director because, although the instruction followed MAI-CR 3d, it was missing an element as established by caselaw. Finding no error, we affirm.

## Factual Background

The tragic facts of this case, viewed in the light most favorable to the verdict, were recounted by this Court on direct appeal in *State v. Scroggs*, 521 S.W.3d 649, 651-53 (Mo. App. W.D. 2017):

> In 2013, Scroggs and her husband[, Matthew,] were living in Pleasant Hill, Missouri with their three children. During the summer, Matthew's mother, Melinda Brown ("Brown") was caring for the children at her home a couple hours away from Pleasant Hill. In early June of 2013, Brown took the three children to visit Pleasant Hill. Brown noticed that Scroggs appeared to be pregnant. She returned again in July and noticed that Scroggs's breasts were enlarged, she had gained weight in her stomach, and her nose was red. This was consistent with how Scroggs looked during her previous

---

[2] We will use these initials for the baby throughout this opinion based on the name M.J.S.'s grandmother chose for him when law enforcement created a birth certificate and death certificate.

[3] Because Krystal and Matthew share the same surname, we will refer to Matthew Scroggs as Matthew. No familiarity or disrespect is intended.

pregnancies. Brown asked Scroggs whether she was pregnant, and Scroggs angrily denied it multiple times.

Their children were returned by Brown to Scroggs and Matthew in August. Brown received a call from Matthew on November 4, 2013, requesting that Brown come to his home. When Brown arrived, Matthew looked like he had not slept and was exhausted, as if he were "crashing." His mood vacillated between sadness and anger. The three children were not at home. Matthew first patted Brown down, as if he were searching for something, and then forced Brown to hand over her keys and cell phone because he wanted to tell her something but did not want her to leave. Matthew informed Brown that Scroggs had delivered a baby [boy] at home and was in the hospital. Brown asked where [M.J.S.] was, and Matthew responded, saying, "[a]ll you need to know is that we took care of it." Matthew also told Brown that there was a stolen car between their garage and a fence.

Brown spoke with law enforcement and told them a stolen car was located on the property, which she had seen the day before, and relayed the information she had received from Matthew about [M.J.S.] She informed police that she believed Scroggs and Matthew had disposed of [M.J.S.'s] body and that they both deal in drugs.

When police arrived, Matthew was placed under arrest and gave his consent for a search of the residence. Police found four glass pipes used for smoking methamphetamine that had white residue on them. An additional thirty unused glass pipes were located in the upstairs of the home along with bags containing marijuana, methamphetamine residue, and additional marijuana pipes.

Police discovered a blue bucket in the garage filled with what appeared to be recently poured concrete. Matthew later admitted that [M.J.S.'s] body was in the bucket and gave permission to police to remove it. The bucket was taken to the medical examiner, who removed and examined the contents. [M.J.S.] was located in the concrete inside a cardboard box for baby wipes and inside a plastic bag that also contained pacifiers, a bottle, a bib, a baby bottle brush, and formula. An additional plastic bag was also in the bucket containing the placenta wrapped in a towel. At the bottom of the bucket was a truck brake rotor.

Scroggs was interviewed twice while in the hospital. She had been admitted for pneumonia and congestive heart failure. Police asked her if she was aware she had given birth to a baby boy on October 7. Scroggs hesitated and stated the birth had taken place a few days after that. Scroggs had learned that she was pregnant in June but she did not want any more children. Scroggs did not obtain any prenatal care or seek any medical treatment during her pregnancy. Although her previous three children had been born in a hospital, she said that she "wanted to do it like they did back in the day." She

3

did not obtain a midwife to help with the birth, and she and Matthew had not told anyone about the pregnancy, not even their children. Scroggs admitted to police that she used methamphetamine and marijuana throughout her pregnancy. She told a Children's Division investigator that she had only used methamphetamine prior to the pregnancy but when told that hair follicle tests would be able to determine whether that was true, she said they would probably find methamphetamine in her system and that she could not remember that last time she had used it.

Scroggs claimed [M.J.S.] was born somewhere between five and seven months into pregnancy and that after he was born [he] looked fine. She claimed that she called a doctor after the birth, whom she picked out of a phone book, and the doctor told her that as long as there was not excess bleeding, everything was okay and there was nothing else she could do. Scroggs did not remember who this doctor was and could not provide any information regarding the doctor's identity.

Scroggs stated that after the birth [M.J.S.] would not breast feed or take a bottle. She told police that she thought he would eventually eat, so she went to sleep. Scroggs stated that when she woke up, [M.J.S.] was "gone," as in deceased. She also stated that she had heard him make a whimpering sound before he died. After she woke up and found [M.J.S.] dead, she put [him] in a box and gave it to Matthew and told him to "bury it in the backyard." However, Scroggs also told a detective, after she got out of the hospital, that she knew [M.J.S.] was in the garage and said she told Matthew not to bury him yet because she wanted to wait until she was healthy enough to help bury [M.J.S.]

An autopsy was performed on [M.J.S.] that determined he was born alive and appeared to be full term. There were no signs of injury or congenital abnormalities. [M.J.S.] had a methamphetamine level in his system of 751 ng/mL. Scroggs had to have used methamphetamine a few days prior to the birth in order for [M.J.S.] to have this level of methamphetamines in his system at birth. This level of methamphetamine would have created stress, increased heart rate, and increased blood pressure in [M.J.S.] This would have created a risk of heart attack, seizure, stroke, or arrhythmia, which could have caused sudden death. [M.J.S.'s] cause of death was "methamphetamine intoxication due to maternal methamphetamine use." Had [M.J.S.] been taken to the hospital, he could have been diagnosed and treated, as there are interventions that could have increased his likelihood of survival. A medical expert testified that the failure to seek medical treatment contributed to [M.J.S.'s] death.

4

Scroggs was convicted of one count of murder in the second degree (Class A Felony), section 565.021;[4] one count of endangering the welfare of a child in the first degree (Class C Felony), section 568.045; and one count of abandonment of a corpse (Class D Felony), section 194.425. Scroggs was sentenced to a term of life imprisonment on count I, a term of seven years' imprisonment on count II, and a term of four years' imprisonment on count III. The judgment of conviction and sentence were affirmed by this Court in *Scroggs*, 521 S.W.3d at 649.

Scroggs filed a timely motion to vacate, set aside, or correct the judgment under Rule 29.15, and appointed counsel timely filed an amended motion. The motion court held an evidentiary hearing, and Scroggs, trial counsel, and appellate counsel testified. The motion court issued findings of fact, conclusions of law, and judgment denying Scroggs's amended motion. This timely appeal follows.

**Standard of Review**

Appellate review of the motion court's judgment under Rule 29.15 is limited to a determination of whether the findings of fact and conclusions of law are clearly erroneous. *Price v. State*, 422 S.W.3d 292, 294 (Mo. banc 2014); Rule 29.15(k). "Findings and conclusions are clearly erroneous only if a full review of the record definitely and firmly reveals that a mistake has been made." *King v. State*, 638 S.W.3d 113, 117 (Mo. App. W.D. 2022) (quoting *Morrow v. State*, 21 S.W.3d 819, 822 (Mo. banc 2000)). "It is incumbent upon the movant in a post-conviction motion to prove his claims for relief by a

---

[4] All statutory references are to Revised Statutes of Missouri (2000), as supplemented through October 2013, unless otherwise indicated.

5

preponderance of the evidence." *Dishmon v. State*, 248 S.W.3d 656, 660 (Mo. App. S.D. 2008); Rule 29.15(i).

## Analysis

"To be entitled to post-conviction relief for ineffective assistance of counsel, the movant must satisfy the two-pronged *Strickland* test." *Jindra v. State*, 580 S.W.3d 635, 641 (Mo. App. W.D. 2019); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "First, the movant must show counsel failed to perform to the degree of skill, care, and diligence that a reasonably competent attorney would under similar circumstances." *Lindsey v. State*, 633 S.W.3d 547, 551 (Mo. App. W.D. 2021). This requires that the movant show that counsel's representation "fell below an objective standard of reasonableness." *Jindra*, 580 S.W.3d at 641; *Strickland*, 466 U.S. at 688. The movant must then show that he was prejudiced by this failure. *Jindra*, 580 S.W.3d at 641. "Prejudice occurs when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Johnson v. State*, 406 S.W.3d 892, 899 (Mo. banc 2013)). "A movant must overcome the strong presumption that counsel's conduct was reasonable and effective." *Id.* "To overcome this presumption, a movant must identify specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Id.* (internal quotations omitted). If a movant fails to satisfy the performance prong, there is no need to address the prejudice prong. *McNeal v. State*, 500 S.W.3d 841, 845 (Mo. banc 2016).

"To prevail on a claim of ineffective assistance of appellate counsel, the movant must establish that counsel failed to raise a claim of error that was so obvious that a competent and effective lawyer would have recognized and asserted it." *Anderson v. State,* 564 S.W.3d 592, 617 (Mo. banc 2018) (internal quotation marks omitted). "There is no duty to raise every possible issue asserted in the motion for new trial on appeal, and no duty to present non-frivolous issues where appellate counsel strategically decides to winnow out arguments in favor of other arguments." *Id.* (internal quotation marks omitted). [Scroggs] must overcome the strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). [Scroggs] must also show that "if counsel had raised the claims, there is a reasonable probability the outcome of the appeal would have been different." *Anderson,* 564 S.W.3d at 617 (internal quotation marks omitted).

*Morrison v. State,* 619 S.W.3d 605, 609-610 (Mo. App. W.D. 2021).

## Points I & II

Scroggs argues, in point I, that the motion court erred in finding appellate counsel was not ineffective in failing to raise, on direct appeal, a sufficiency of the evidence claim to Scroggs's conviction of child endangerment in the first degree based on insufficient evidence that Scroggs's failure to obtain medical care for M.J.S. "created" a substantial risk to M.J.S.'s life, body, or health. "Where the evidence was sufficient to support the movant's convictions, appellate counsel will not be deemed ineffective for failing to challenge the sufficiency of the evidence on direct appeal on those counts." *McAllister v. State*, 643 S.W.3d 124, 136 (Mo. App. E.D. 2022).

It is of note that appellate counsel on direct appeal did in fact raise two separate sufficiency of the evidence claims regarding the charge of endangering the welfare of a child. *Scroggs*, 521 S.W.3d at 653. In the first point on appeal, appellate counsel challenged that the evidence at trial failed to establish the element of a "knowing" violation

7

of the statute. *Id.* In the second point on direct appeal, Scroggs's appellate counsel raised a claim that the evidence at trial was not sufficient to prove that the failure to seek medical care for the child "caused" the baby's death. *Id.* at 655. Now, Scroggs alleges appellate counsel was ineffective for not raising the additional claim that the evidence at trial was insufficient to establish that Scroggs's failure to obtain medical care "created" a substantial risk to the child. At the evidentiary hearing on Scroggs's motion, appellate counsel testified that he did not raise this claim on direct appeal because the issue had already been finally decided by the appellate court in *State v. Rinehart*, 383 S.W.3d 95, 101 (Mo. App. W.D. 2012). Appellate counsel testified that he was particularly aware of the *Rinehart* case because he was the appellate counsel in *Rinehart* and had raised and lost the issue that the failure to obtain medical care could legally "create" the substantial risk to a child as required by the statute. The record clearly establishes that appellate counsel recognized and considered raising this claim on direct appeal but strategically and rationally chose to raise the claims that were in fact raised because this specific claim had already been rejected by the appellate court in *Rinehart*. Scroggs has failed to establish that appellate counsel was ineffective as, first, appellate counsel did not fail to recognize this claim and second, appellate counsel properly determined, following *Rinehart*, there was no reasonable probability that such a claim would have been successful. Scroggs has failed to establish that outcome of the appeal would have been different had this claim been raised.

A person commits the offense of endangering the welfare of a child in the first degree if she knowingly acts in a manner that "creates a substantial risk to the life, body,

8

or health of a child less than seventeen years of age[.]" Section 568.045. "A parent's failure to provide or obtain adequate medical care for a child can be the basis for a child endangerment conviction." *State v. Rinehart*, 383 S.W.3d 95, 101 (Mo. App. W.D. 2012). "It is clear that, if a child was in actual need of certain medical treatments and a parent failed to obtain treatment which was necessary to prevent harm to the life, body or health of a child, then the parent exposed the child to an actual danger, and thus the parent created a substantial risk to the life, body, or health of the child." *State v. Wilson*, 920 S.W.2d 177, 180 (Mo. App. W.D. 1996). In a child endangerment case, the State is "not required to prove Defendant's actions caused Victim's death." *State v. Fowler*, 435 S.W.3d 90, 95 (Mo. App. S.D. 2014). Rather, the State is required "to prove risk *i.e.*, the *possibility* of loss, injury, or disadvantage." *Id.* "The fact that the failure to provide medical treatment creates a risk to the child may be established by expert testimony." *Wilson*, 920 S.W.2d at 180.

Here, appellate counsel was not ineffective in failing to raise a sufficiency claim on the charge of child endangerment in the first degree because sufficient evidence supported Scroggs's conviction, in that Scroggs's failure to obtain medical care for M.J.S. created a risk to his life. The evidence in the record showed that immediately after M.J.S. was born, he would not breast feed or take a bottle. Rather than seek medical help, Scroggs went to sleep. Scroggs knew that she had not sought any prenatal care during her pregnancy and had used methamphetamine and marijuana during the pregnancy, and M.J.S.'s autopsy established that Scroggs had used methamphetamine shortly before M.J.S.'s birth. An expert witness at trial testified that if M.J.S. had received medical attention when his heart

9

rate and blood pressure increased, either at a hospital or in an ambulance, his condition would have been diagnosed and could have been treated. Medications could have been given to help lower M.J.S.'s blood pressure. Medical professionals would have also been able to defibrillate M.J.S. and administer further medications in the event that he suffered a heart attack, and paramedics called to the home may have been able to intubate M.J.S. when he failed to maintain oxygen. The expert testified that the failure to seek medical attention was a contributing factor in M.J.S.'s death.

Scroggs argues there was insufficient evidence that the failure to obtain medical care *created* the risk to M.J.S.'s life because the medical expert testified at trial that the cause of death was maternal methamphetamine use. Therefore, according to Scroggs, the substantial risk to M.J.S.'s life was actually created before he was born and was a preexisting condition. However, this argument conflates the multiple risks at issue. It is clear that Scroggs created a risk to M.J.S.'s health by using illegal substances including methamphetamine throughout the pregnancy.[5] Scroggs's failure to obtain medical care for M.J.S. after his birth created an additional risk that is subject to criminal liability under section 568.045. Although maternal methamphetamine use was the cause of death, the expert witness also testified that Scroggs's failure to seek medical attention for M.J.S. was a contributing factor in M.J.S.'s death. As we stated in the direct appeal:

> The evidence at trial was that Scroggs and Matthew concealed Scroggs's pregnancy, even lying to Matthew's mother when directly asked if she was pregnant. They were the only two people who knew about the baby's existence. As opposed to Scroggs's previous three births in the hospital,

---

[5] Scroggs's methamphetamine use while pregnant was not alleged as a basis for child endangerment in the charging document, pursuant to *State v. Wade*, 232 S.W.3d 663, 666 (Mo. App. W.D. 2007). The only basis for child endangerment in this case as charged is the failure to obtain medical care for M.J.S. after he was born.

10

Scroggs chose to have the child at home without any help from a midwife or any other person, whether medically trained or not. Scroggs admitted she used methamphetamine during her pregnancy. The baby's autopsy established that she had used methamphetamines shortly before the baby's birth. Scroggs sought no prenatal care or any other medical care during her pregnancy. After the child was born, Scroggs admitted that the baby would not eat. Rather than seek medical help, she went to sleep. After the fact, she created a ludicrous story that she called an unidentified doctor she picked out of the phonebook after the birth who told her everything was fine without seeing her or the child. The child died shortly after birth. Rather than contact the appropriate authorities, Scroggs and Matthew decided to clandestinely dispose of the child's body. Scroggs's conduct before, during, and after the pregnancy are all indicative that she knew her methamphetamine use would harm her child. The jury could infer that Scroggs's failure to obtain medical care for her child after birth was consistent with her previous conduct; she knew her drug use would harm her child and she knowingly chose not to seek medical care for the child to hide her illicit drug use.

*Scroggs*, 521 S.W.3d at 655.

From this evidence and the medical testimony, a reasonable juror could have concluded that the failure to obtain medical care for M.J.S. created a substantial risk to his life, beyond a reasonable doubt. As was thoroughly explained in our prior opinion in *Scroggs*, "Death of a newborn infant is the natural and foreseeable consequence of failing to provide medical care where, as is the case here, the mother *knows* that she consumed methamphetamines during pregnancy and immediately before birth." *Id.* at 656. We further stated, "In Missouri, it is inconsequential that Scroggs's conduct was not the immediate cause of death; it is sufficient that the conduct was a contributing cause of death." *Id.*

Scroggs argues herein that *Rinehart* is distinguishable from this case because, in *Rinehart*, the son was severely ill for months without receiving medical attention, whereas

11

M.J.S. was only alive for one day. 383 S.W.3d at 98. However, other Missouri cases have held that waiting even "thirty minutes before calling 911 creates a substantial risk to the life and health of the child." *State v. Johnson*, 402 S.W.3d 182, 187 (Mo. App. E.D. 2013). Regardless, even if *Rinehart* were marginally distinguishable from this case, appellate counsel was not ineffective for relying on it in deciding not to raise the additional sufficiency challenge because *Rinehart* was clear in its holding that the appellant both "knowingly" created the substantial risk and "created" the substantial risk to the life of the baby.

Appellate counsel's reliance on *Rinehart* in deciding not to raise multiple sufficiency challenges to the same count did not fall below an objective level of reasonableness. In addition, Scroggs failed to demonstrate that there is a reasonable probability of a different outcome, even if appellate counsel had raised the additional sufficiency argument. Sufficient evidence supported Scroggs's conviction for the felony offense of child endangerment in the first degree. Scroggs concedes that because her felony murder conviction was based on the felony of child endangerment in the first degree, if we deny Point I on appeal then we must also deny Point II on appeal. Accordingly, Points I and II are denied.

## Point III

Scroggs argues the motion court erred when it found appellate counsel was not ineffective in failing to raise, on direct appeal, a sufficiency of the evidence claim to Scroggs's conviction of abandonment of a corpse, in that there was insufficient evidence that Scroggs and Matthew "disposed" of M.J.S.'s body because they never relinquished

12

possession of it. Scroggs fails to even address how this claim was "so obvious that a competent and effective [appellate] lawyer would have recognized and asserted it." *Anderson v. State,* 564 S.W.3d 592, 617 (Mo. banc 2018) (internal quotation marks omitted). As previously noted, "[w]here the evidence was sufficient to support the movant's convictions, appellate counsel will not be deemed ineffective for failing to challenge the sufficiency of the evidence on direct appeal on those counts." *McAllister*, 643 S.W.3d at 136.

"A person commits the crime of abandonment of a corpse if that person abandons, disposes, deserts or leaves a corpse without properly reporting the location of the body to the proper law enforcement officials in that county." Section 194.425. "The concept of 'abandonment' in the statute clearly is based upon a person having an interest in, or duty with respect to, the body." *State v. Bratina*, 73 S.W.3d 625, 627 (Mo. banc 2002). "To abandon, the dictionary tells us, is 'to cease to assert or exercise an interest, right or title to esp. with the intent of never again resuming or reasserting it . . .' or 'to forsake or desert esp. in spite of an allegiance, duty, or responsibility.'" *Id.* "The words that the statute uses to describe the concept of abandonment are 'abandon, disposes, deserts or leaves.' The first three words contain the concept that the person has a relationship or duty with respect to the body. To dispose of something implies that one has possession of it." *Id.*

Here, appellate counsel was not ineffective in failing to raise a sufficiency challenge because the record supported Scroggs's conviction for abandonment of a corpse. The evidence presented at trial showed that in early November police discovered a blue bucket in the garage with what appeared to be recently poured concrete. Matthew later admitted

13

that M.J.S.'s body was in the bucket and gave permission to police to remove it. Scroggs acknowledged M.J.S. was born in early October. The bucket was taken to the medical examiner, who removed and examined the contents. M.J.S. was located in the concrete inside a cardboard box for baby wipes and inside a plastic bag that also contained pacifiers, a bottle, a bib, a baby bottle brush, and formula. An additional plastic bag was also in the bucket containing the placenta wrapped in a towel. At the bottom of the bucket was a truck brake rotor. Scroggs admitted that she placed the body in a box and told Matthew to "bury it in the backyard." Although the bucket with M.J.S.'s body was found on Scroggs's property in the garage, the evidence was sufficient for a jury to find that Scroggs had no intention of recovering the body. It was approximately one month after the child's birth that its body was found encased in a bucket of concrete that had to be chiseled away in order for the body to be recovered and autopsied. The body was also found inside an empty box of baby wipes and alongside baby supplies and a brake rotor, further illustrating Scroggs's desire to forsake and discard these items. As we stated in *Scroggs*, "Rather than contact the appropriate authorities, Scroggs and Matthew decided to clandestinely dispose of the child's body." 521 S.W.3d at 655.

Scroggs argues that *Bratina* supports her argument that appellate counsel was ineffective for not raising a sufficiency challenge regarding the disposal of M.J.S.'s body. In *Bratina*, a case in which Bratina left his dead wife's body on the floor of their apartment for three to four hours before returning, the Supreme Court considered a void for vagueness challenge to section 194.425 regarding the word "leaves" in the statute. 73 S.W.3d at 627. The Court applied the maxim of statutory construction, *noscitur a sociis*, ("it is known from

14

its associates") to interpret "leaves" alongside its textual neighbors, "abandon," "disposes," and "deserts." *Id.* at 627 n.5. In doing so, the Court held that the statute was not vague or ambiguous because "these terms all have as part of their meaning a relationship or duty with respect to the dead body." *Id.* at 627. The Court then remanded the case for trial for a factual determination regarding whether the defendant had knowingly abandoned his wife's corpse because "[t]he fact that Bratina returned to the apartment some three to four hours later may negate the conclusion that he intended to abandon the body of his wife." *Id.* at 628. The Court's holding in *Bratina* does not aid Scroggs. Here, the only issue is whether Scroggs "disposed" of M.J.S.'s body. The dictionary defines "dispose" as "to get rid of."[6] It is clear from the evidence that Scroggs "got rid of" M.J.S.'s body by placing it in an empty box of baby wipes, encasing it in a bucket of concrete with other discarded items, and leaving it in the garage for approximately one month before it was discovered by police. This case is readily distinguishable from *Bratina*, based on the extended period of time between M.J.S.'s body being placed in the bucket of concrete and its discovery, compared to the brief period of a few hours that Bratina left the house before returning. The Court in *Bratina* remanded the case so the jury could evaluate the facts of the case and the defendant's mental state, but this Court already affirmed Scroggs's "knowing" mental state on direct appeal in accordance with *Bratina's* interpretation of section 194.425. *See Scroggs*, 521 S.W.3d at 654-55. Therefore, *Bratina* does not support the notion that

---

[6] Merriam-Webster's Unabridged Dictionary, www.merriam-webster.com (last visited Sept. 29, 2022).

appellate counsel was ineffective in failing to raise a sufficiency challenge to Scroggs's conviction for abandonment of a corpse.

Point III is denied.

## Point IV

Scroggs argues the motion court erred when it found trial counsel was not ineffective in failing to object to the state's proposed verdict director and in failing to offer an additional element to the abandonment of a corpse verdict directing instruction. "The general rule is that instructional errors are not cognizable in a Rule 29.15 proceeding." *Hill v. State*, 532 S.W.3d 744, 750 (Mo. App. E.D. 2017). "Not only is instructional error generally non-cognizable in a post-conviction proceeding, it is even less likely to be cognizable where, as here, the evidence supporting the movant's conviction was reviewed on direct appeal and found to be sufficient to sustain the conviction." *Id.* Regardless, trial counsel's conduct did not fall below an objective level of reasonableness because the jury instruction properly stated the applicable law.

> The jury received the verdict director based on MAI-CR 3d 332.84 and stated:
>
> A person is responsible for her own conduct and she is also responsible for the conduct of another person in committing an offense if she acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, she aids or encourages the other person in committing it.
>
> As to Count III, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or between October 1, 2013 and October 31, 2013, in the County of Cass, State of Missouri, Matthew Scroggs disposed of the corpse of M.J.S. at 304 Cline Street, Pleasant Hill, and

16

Second, that at the time Matthew Scroggs disposed of the corpse of M.J.S. he was aware that M.J.S. was dead, and

Third, that at the time Matthew Scroggs disposed of the corpse, the defendant was the mother of M.J.S., and

Fourth, that at the time Matthew Scroggs disposed of the corpse, Matthew Scroggs did so without properly reporting the location of the body to the proper law enforcement officials, and

Fifth, that with respect to the facts and conduct submitted in this instruction, Matthew Scroggs acted knowingly,

Then you are instructed that the offense of abandonment of a corpse has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Sixth, that with the purpose of promoting or furthering the commission of that abandonment of a corpse, the defendant aided or encouraged Matthew Scroggs in committing the offense, then you will find the defendant guilty under Count III of abandonment of a corpse.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

Scroggs argues trial counsel should have objected to this MAI approved jury instruction and proposed an additional element to the jury instruction, pursuant to *Bratina*. In *Bratina*, the Court stated, "To dispose of something implies that one has possession of it."  73 S.W.3d at 627.  Therefore, according to Scroggs, the Supreme Court created an additional element to the abandonment of a corpse statute, and the jury instruction should have accounted for this additional element by providing another paragraph in the instruction, such as, "Fourth, that at the time Scroggs disposed of the corpse, defendant had

17

no intention of returning to the corpse or retaining control over the corpse."[7] We disagree. The Supreme Court in *Bratina* did not create an additional element to section 194.425. As discussed previously, the Court interpreted the statutory words used to find that a defendant had abandoned a corpse and held that the word "leaves" is not vague or ambiguous because it must be read in conjunction with its surrounding words, namely "abandon," "dispose," and "deserts." *Bratina*, 73 S.W.3d at 627. The Court stated that "[t]o dispose of something implies that one has possession of it" simply to highlight the preceding sentence that "[t]he first three of these words contain the concept that the person has a relationship or duty with respect to the body." *Id.* This relationship or duty requirement is reflected in paragraph three of the jury instruction. *See* MAI-CR 3d 332.84, Notes on Use, 2. The jury did not need to find that Scroggs had possession of M.J.S.'s body because, as the Court noted, possession is implicit in the notion of disposing. The plain meaning of "dispose," as previously discussed, was sufficient to instruct the jury on a violation of section 194.425. And trial counsel was not ineffective in failing to object and offer this additional element to the verdict director.

Point IV is denied.

---

[7] Scroggs's appellate brief suggests numerous alternative paragraphs that she argues should have been included in the instructions that she believes would comply with the Court's ruling in *Bratina*. We included one of her suggestions to illustrate her argument.

18

## Conclusion

For the foregoing reasons, the judgment of the motion court is affirmed.

_____
Gary D. Witt, Judge

All concur